IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FORD LAUDERDALE DIVISION

CASE NO.: _____

BENADMIN, INC., a Utah Corporation;
and AVREC ENTERPRISES, INC., a Utah
Corporation,

    Plaintiffs,

vs.

MDLIVE, INC., a Delaware Corporation,

    Defendant.

DEMAND FOR JURY TRIAL

/

## COMPLAINT

COME NOW Plaintiffs BenAdmin, Inc., a Utah corporation ("BenAdmin") and Avrec Enterprises, Inc., a Utah corporation ("Avrec") (together, sometimes, "Plaintiffs"), by and through their undersigned counsel and files as its Complaint against MDLive, Inc., a Delaware corporation ("MDLive" or "Defendant"), the following:

## JURISDICTION

1. This Court has jurisdiction over this matter under Title 28, Section 1332(a)(1) of the United States Code because Plaintiffs are citizens of a different state than Defendant and the sum or value of the matter in controversy exceeds $75,000.

## PARTIES

2. Defendant is, and at all relevant times has been, a provider of telehealth services to resellers and third-party administrators of insurance plans for employers, and maintains an office at 3350 SW 148th Avenue, Suite 300, Miramar, Florida, 33027.

3. BenAdmin is and at all relevant times has been a duly licensed and insured third-party administrator, and maintains an office at 4746 South 900 East, Suite 210, in Salt Lake City, Utah, 84117.

4. Avrec is and at all relevant times has been a duly licensed and insured marketer of insurance products, and maintains an office at 4746 South 900 East, Suite 210, in Salt Lake City, Utah, 84117.

5. BenAdmin and Avrec are corporate affiliates, and have common ownership.

**VENUE**

6. Venue is proper in this Court under Title 28, Sections 1391(b)(1) and (2) because Defendant has its headquarters in Miramar, Broward County, Florida.

**NATURE OF CASE**

7. This is an action for multiple breaches of contract, declaratory judgment, misappropriation of trade secrets, and tortious interference with economic relations, arising from a contract between each of Plaintiffs and Defendant.

8. As part of this case, BenAdmin seeks a declaratory judgment that it does not owe the sum of approximately $147,652.00, or any sums whatsoever, to Defendant under its contract with MDLive.

**FACTUAL BACKGROUND**

9. BenAdmin was formed in mid-2017 to act as a third-party administrator which bills smaller companies for telehealth services, pays commissions owed to insurance resellers or agents, and pays the net cost to a telehealth services provider like MDLive.

10. The next year, BenAdmin entered into that certain MDLIVE Services Agreement, dated as of February 20, 2018, with MDLive (the "Services Contract").

11. A true and correct copy of the Services Contract is attached as **Exhibit 1**.

12. Under the Services Contract, BenAdmin was required to market MDLive's services to BenAdmin's clients and administer access to those services for clients that wished to enroll.

13. The Services Contract includes confidentiality provisions requiring that MDLive keep confidential and not use to its own benefit certain confidential information, including trade secrets, of BenAdmin. *See* Ex. 1, §§ 13.1 to 13.6.

14. BenAdmin's client list is a trade secret, insofar as BenAdmin has taken reasonable measures to keep its client list secret (like requiring employees and vendors to sign agreements in which they agree to keep the identities of clients confidential) and its client list derives independent economic value from not being generally known to, nor readily ascertainable by, others in the industry.

15. To facilitate BenAdmin's marketing of MDLive's services to BenAdmin's clients, and in furtherance of the Services Contract, MDLive provided BenAdmin's personnel with e-mail addresses of MDLive's primary domain name, mdlive.com.

16. MDLive allowed and encouraged BenAdmin's personnel to contact BenAdmin's clients using the @mdlive.com e-mail addresses, rather than a BenAdmin e-mail address.

17. Expressed, or at the very least implied, by MDLive's giving BenAdmin personnel those e-mail addresses was a license to use those e-mail addresses that would continue for as long as the Contract remained in effect (the "License").

18. But for that License, BenAdmin would not have used the @mdlive.com e-mail addresses in order to communicate with BenAdmin's clients.

19. However, believing it would always have access to the e-mails received at those @mdlive.com e-mail addresses due to the License, BenAdmin began to use those @mdlive.com

e-mail addresses to communicate with its clients for the purpose of fulfilling its obligations under the Services Contract.

20. BenAdmin used those @mdlive.com e-mail addresses as described for approximately three years.

### MDLive Overcharges Customers for MDLive's PRIME Product

21. Avrec was formed in late 2007 to act as an independent marketer of insurance and insurance-related products and services.

22. In late 2016, Avrec entered into that certain General Agent Agreement, dated as of November 1, 2016, with MDLive (the "Agent Contract").

23. A true and correct copy of the Agent Contract is attached as **Exhibit 2**.

24. Pursuant to the Agent Contract, Avrec was required to market a product MDLive referred to as "PRIME."

25. Just like the Services Contract, the Agent Contract includes certain confidentiality provisions requiring MDLive to keep confidential and not use to its own benefit confidential information like "client names" and other trade secrets of Avrec. *See* Ex. 2, §§ 4(i) and (j).

26. The PRIME product was effectively a bundled product. For one price, it included a bundle of medical-telemedicine services, behavioral-telemedicine services, access to the GoodRX card, a transparency-in-pricing tool (whereby the actual cost of a particular service could be readily ascertained), and a second-opinion tool (whereby a user could upload their medical records and pay for a second opinion from an expert).

27. The latter three services in the bundle (the GoodRX card, transparency-in-pricing tool, and second-opinion tool) were not services provided by MDLive, but were to be obtained through contracts MDLive had with third-party providers.

28. MDLive priced the PRIME product at approximately $9 per member per month. Its ordinary telehealth service, by contrast, was priced at approximately $0.60 per member per month for telemedicine and $0.70 per member per month for behavioral health, in each case plus fees that vary depending on the level of utilization but all of which are believed as of today's date to exceed $100,000.

29. In large part because it was overpriced, the PRIME product never experienced the success MDLive wanted it to experience.

30. Despite its marketing to customers wherein it promised to provide the services in the PRIME bundle, MDLive unilaterally dropped its contracts with the third-party providers that provided the GoodRX card, the transparency-in-pricing tool, and the second-opinion tool.

31. Unsurprisingly, those functions then stopped working, even for customers who paid for access to them as part of the PRIME bundle.

32. Without these three services, the PRIME product effectively became no different than MDLive's ordinary telehealth service, which was priced at less than one-third the cost of the PRIME product.

33. Despite the fact that three of the five services included in the PRIME bundle were no longer working and that the PRIME product without those services was effectively no different than its ordinary telehealth service (which was less than one-third the price of the PRIME product), MDLive continued to bill customers for the full price of the PRIME product.

34. MDLive never voluntarily disclosed to Avrec or users of the PRIME product that it was overbilling them by charging them for aspects of the PRIME product never actually provided. Instead, Avrec discovered this defect in the PRIME product during a demonstration for one of its clients, and immediately alerted MDLive to the problem.

35. MDLive, however, did nothing to fix the problem, and continued to overcharge the customers who purchased its PRIME product.

36. BenAdmin (Avrec's affiliate) has offered to switch customers who purchased the PRIME product to a less expensive alternative, but the customers have foregone enrollment in telemedicine services altogether because of issues with the PRIME product, costing BenAdmin revenue it would have otherwise received and causing harm to Avrec's reputation with customers.

37. In fact, had Avrec known about the deficiencies in MDLive's PRIME product, then Avrec would have referred its customers to BenAdmin to be instead enrolled in MDLive's ordinary telehealth services, since the difference between the pricing of the two products made the latter more profitable to the common ownership of Avrec and BenAdmin. BenAdmin has thus suffered direct damages from MDLive's false advertising, in the amount believed to be at least $100,000, including interest.

38. Despite the fact that three of the five services included in the PRIME bundle are no longer working, MDLive continued to falsely advertise its PRIME bundle as if they were, including on its website and on the popular video site YouTube.com.

**MDLive Misappropriates Avrec's Client List**

39. At the end of 2020, Avrec was close to closing a deal with one of its clients that would be worth more than $720,000 per year to Avrec, with a strong likelihood the value would have only grown each month.

40. MDLive was aware of this deal, and in January 2021, revoked BenAdmin's access to the @mdlive.com e-mail addresses without notice or warning to BenAdmin or Avrec, and began attempting to negotiate the deal itself directly with Avrec's client.

41. Fortunately, that particular client remained loyal to Avrec and refused to deal directly with MDLive.

42. Avrec has since learned that MDLive may be doing an end-run around Avrec with two other Avrec clients, and may be continuing to negotiate directly with those clients, depriving Avrec of commissions Avrec would otherwise receive from any sales to those clients, which are estimated to be at least $100,000.

43. Nevertheless, MDLive has not restored BenAdmin's access to the @mdlive.com e-mail addresses, and MDLive's decision to revoke BenAdmin's access to the @mdlive.com e-mail addresses without notice or warning severely damaged BenAdmin's business.

44. More specifically, many of BenAdmin's clients had only communicated with BenAdmin using those @mdlive.com e-mail addresses, and were unaware of any other e-mail address to use.

45. Many of BenAdmin's clients, who have managed to make contact via other means (e.g., telephone) have expressed frustration that BenAdmin is not tending to their needs.

46. Upon information and belief, MDLive is now using e-mails received from clients of BenAdmin at the @mdlive.com e-mail addresses to further misappropriate BenAdmin's client list for its own benefit and tortiously interfere with BenAdmin's relationships with its clients, in the same or a similar manner to that in which MDLive already attempted to tortiously interfere with BenAdmin's client relationship in the aforementioned $720,000 deal.

**MDLive Invoices BenAdmin for Overutilization in Violation of the Contract**

47. Around the time MDLive began to tortiously interfere with Avrec's relationships with its clients, MDLive also claimed to have audited the past utilization of MDLive's services by BenAdmin's clients, and sent BenAdmin an invoice for alleged overutilization of those services. The amount MDLive has claimed it is owed on that invoice is at least $131,161.00.

7

48. The only provision of the Services Contract that permits MDLive to audit past utilization of its services and recoup costs for that overutilization is in Exhibit A, which is referenced in Section 7.4 of the Services Contract, which provides as follows:

> *Excess Usage/Utilization* The entire block of Company business (who have elected the Consult Included Medical and/or Dermatology benefit) will be pooled by MDLIVE into one group for purposes of excess usage analysis and pricing calculation. Excess usage will be adjusted annually to compensate for prior year excess. All tele-medical consults are included in the PEPM up to 10% annually. Pricing shall be adjusted at the beginning of the following year at the rate of $0.25 PEPM (additional $0.05 PEPM for Dermatology) for each 5% increase above the 10% threshold measured in the prior year. Annualized utilization is measured by dividing the annual number of consults (for medical and dermatology) in the aggregate covered population by the annual (average) aggregate number of covered employees (paid members) in the covered population.

49. The only other provision of the Services Contract that pertains to auditing is Section 16, and that provision deals only with auditing of books and records to determine over- or under-payment, and not with utilization.

50. Despite the fact that the above-excerpted provision provides that "[e]xcess usage will be adjusted annually" and that "[p]ricing shall be adjusted at the beginning of the following year," MDLive's invoice for more that $131,000 purported to bill BenAdmin in 2021 for alleged overutilization purportedly occurring as much as three years earlier, in violation of the Service Contract, in 2018 and 2019.

51. MDLive had never before invoiced or otherwise purported to audit or adjust the pricing under the Contract, and most certainly not at "the beginning of the following year" for 2018, 2019, or 2020.

52. Indeed, BenAdmin has fully paid every invoice it has ever received from MDLive, until the above-described invoice for more than $131,000.

53. Once MDLive tortiously interfered with Avrec's client relationships, MDLive then began to invoice BenAdmin monthly for supposed overutilization under the Services Contract,

even though the Services Contract only allows for adjustment due to "excess usage" annually, "at the beginning of the following year. Ex. A to Ex. 1; *accord* Ex. 1, § 7.4.

54. With those additional invoices, MDLive claimed BenAdmin owes it an additional $12,189 for January, February, and March 2021, and $4,302 for April 2021.

55. BenAdmin does not owe MDLive for any overutilization, period, due to MDLive's failure to adhere to the contract provisions that permit it compensation for that excess usage. Specifically, BenAdmin structures its arrangements with its customers to permit it to pass along overutilization charges to those customers, but only if MDLive adheres to provisions in the Services Contract, and would be harmed if it was required to compensate MDLive for any of the claimed overutilization without conformity to those terms, since BenAdmin would be unable to pass those charges to its customers.

## COUNT I:
### Breach of Contract – BenAdmin Against MDLive
### (Common Law)

56. The allegations set forth in paragraphs 1 through 55 above are incorporated herein and realleged in support of this Count.

57. A binding and enforceable contract(s) exists between BenAdmin and MDLive in the Services Contract and the License.

58. MDLive materially breached the Services Contract and the License when MDLive:

    a. Revoked the @mdlive.com e-mail addresses it had provided to BenAdmin to use in fulfilling its obligations under the Services Contract, which BenAdmin came to rely upon in carrying out those obligations;

    b. Used for its own benefit the identities of clients and customers to which it was introduced by BenAdmin pursuant to the Services Contract; and

   c. Purported to charge BenAdmin for alleged the overutilization of MDLive's services for years well before 2020, and monthly in 2021.

59. BenAdmin has been damaged by the breaches described in paragraph 58 in such an amount as will be proved at trial, but in no event less than $200,000.

60. Furthermore, MDLive's breach of the Services Contract and the License described above in paragraph 58.b above has harmed and continues to irreparably harm BenAdmin's goodwill among its clients both because for the reasons set forth in paragraphs 40 and 46, MDLive is, upon information and belief, continuing to misappropriate BenAdmin's client list, and MDLive is further damaging BenAdmin's goodwill.

61. Accordingly, BenAdmin is not only entitled to its damages, but to preliminary and/or permanent injunctions that preclude MDLive from having any further contact with any BenAdmin client or customer.

## COUNT II:
### Breach of Contract – Avrec Against MDLive
### (Common Law)

62. The allegations set forth in paragraphs 1 through 55 above are incorporated herein and realleged in support of this Count.

63. A binding and enforceable contract exists between Avrec and MDLive in the Agent Contract.

64. MDLive materially breached the Agent Contract and the License when MDLive used for its own benefit the identities of clients and customers to which it was introduced by Avrec pursuant to the Agent Contract.

65. Avrec has been damaged by the breaches described in paragraph 64 in such an amount as will be proved at trial, but in no event less than $100,000.

66. Furthermore, MDLive's breach of the Agent Contract described above in paragraph 64 above has harmed and continues to irreparably harm Avrec's goodwill among its clients and as described in paragraph 42, MDLive is, upon information and belief, continuing to misappropriate Avrec's client list, and MDLive is further damaging Avrec's goodwill.

67. Accordingly, Avrec is not only entitled to its damages, but to preliminary and/or permanent injunctions that preclude MDLive from having any further contact with any Avrec client or customer.

### COUNT III:
### Fraudulent Inducement – BenAdmin Against MDLive
### (Common Law)

68. The allegations set forth in paragraphs 1 through 55 above are incorporated herein and realleged in support of this Count.

69. Between about autumn 2017 and early 2018, Chuck Hector, MDLive's Chief Sales Officer, told SarahAnn Whitbeck of BenAdmin that the @mdlive.com e-mail addresses MDLive was providing to BenAdmin would remain in effect for the duration of the Contract (the "First Representation").

70. Ms. Whitbeck specifically asked Mr. Hector about this issue as BenAdmin was in the process of negotiating the Contract, because she thought that the arrangement was odd.

71. Between about autumn 2019 and early 2020, Drew Ben-Aharon, MDLive's Senior Vice President of Sales, reiterated the First Representation to Ms. Whitbeck, affirming that as long as the Contract remained in effect, BenAdmin would always have access to the @mdlive.com e-mail addresses (the "Second Representation").

72. (The First Representation and Second Representation are collectively referred to as the "Representations.")

73. If MDLive denies the existence of the License, then upon information and belief:

      a.     MDLive knew the Representations were false when they were made; and

      b.     MDLive made the Representations with the intent to induce BenAdmin to rely upon them and thereby provide MDLive with access and a direct line of communication to BenAdmin's clients, so that MDLive could one day tortiously interfere with the relationships BenAdmin has with its clients, just like it attempted to do as described in paragraph 40 above.

74.     BenAdmin relied upon the Representations without knowing they were false, and has been injured by that reliance, including the above-described injuries to its relationships with clients and other goodwill.

75.     BenAdmin's damages from its reliance on the Representations will be proved at trial, but in no event are less than $200,000.

76.     Upon information and belief, MDLive made the Representations willfully, and acted with reckless disregard for BenAdmin's rights.

77.     Accordingly, BenAdmin is also entitled to punitive damages, in such an amount as the Court finds just and warranted in the circumstances.

### COUNT IV:
### Misappropriation of Trade Secrets – Plaintiffs Against MDLive
### (Federal Law, 18 U.S.C. § 1836)

78.     The allegations set forth in paragraphs 1 through 55 above are incorporated herein and realleged in support of this Count.

79.     Plaintiffs employ reasonable measures to ensure the secrecy of their client lists, and those client lists derive independent economic value, actual or potential, from not being generally known to, nor readily ascertainable by, others in the industry.

80.     By revoking BenAdmin's access to @mdlive.com e-mail accounts without notice of warning and thereafter using those e-mails to communicate with and otherwise attempt to secure

for itself BenAdmin's clients, despite its obligation under the Contract to maintain the secrecy of BenAdmin's client list and only use BenAdmin's client list for BenAdmin's benefit, MDLive has misappropriated BenAdmin's client list.

81. By attempting an end-run around Avrec directly to Avrec's client as described in paragraphs 39 through 42 above, despite an obligation to maintain the secrecy of Avrec's client list and only use Avrec's client list for Avrec's benefit, MDLive has misappropriated Avrec's client list.

82. Accordingly, Plaintiffs are entitled to its damages in an amount to be proved at trial but in no event less than $100,000, injunctive relief, and any other remedy provided in Title 18, Section 1836 of the United States Code and appropriate under the circumstances.

**COUNT V:**
**Misappropriation of Trade Secrets – Plaintiffs Against MDLive**
**(State Law, FL. STAT. §§ 688.001-009)**

83. The allegations set forth in paragraphs 1 through 55 above are incorporated herein and realleged in support of this Count.

84. Plaintiffs employ reasonable measures to ensure the secrecy of their client lists, and those client lists derive independent economic value, actual or potential, from not being generally known to, nor readily ascertainable by, others in the industry.

85. By revoking BenAdmin's access to @mdlive.com e-mail accounts without notice of warning and thereafter using those e-mails to communicate with and otherwise attempt to secure for itself BenAdmin's clients, despite its obligation under the Contract to maintain the secrecy of BenAdmin's client list and only use BenAdmin's client list for BenAdmin's benefit, MDLive has misappropriated BenAdmin's client list.

86. By attempting an end-run around Avrec directly to Avrec's client as described in paragraphs 39 through 42, despite an obligation to maintain the secrecy of Avrec's client list and only use Avrec's client list for Avrec's benefit, MDLive has misappropriated Avrec's client list.

87. Accordingly, Plaintiffs are entitled to damages in an amount to be proved at trial but in no event less than $100,000, injunctive relief, and any other remedy provided in Sections 688.003 through 688.005 of the Florida Statutes and appropriate under the circumstances.

## COUNT VI:
### Tortious Interference with Business Relations – Plaintiffs Against MDLive
### (Common Law)

88. The allegations set forth in paragraphs 1 through 55 above are incorporated herein and realleged in support of this Count.

89. Plaintiffs have existing business relationships with their clients, including the client with whom Avrec was negotiating the deal described in paragraphs 39 and 40 above and the clients with whom BenAdmin communicated using the @mdlive.com e-mail addresses.

90. MDLive knew about Plaintiffs' relationships with their clients, since many of those clients, and especially the ones who were communicating with BenAdmin using the @mdlive.com e-mail addresses, were receiving or going to receive services from MDLive through BenAdmin or as a result of sales efforts by Avrec.

91. By revoking, without notice or warning, BenAdmin's access to the @mdlive.com e-mail accounts MDLive had earlier induced BenAdmin into using to communicate with its clients, and then by attempting to squeeze BenAdmin and Avrec out of relationships with their respective clients, MDLive intentionally and unjustifiedly interfered with Plaintiffs' relationships with those clients.

92. Plaintiffs have been damaged by MDLive's tortious interference, in an amount to be proved at trial, but in no event less than $100,000.

## COUNT VII:
### False Advertising – Plaintiffs Against MDLive
### (15 U.S.C. § 1125)

93. The allegations set forth in paragraphs 1 through 55 above are incorporated herein and realleged in support of this Count.

94. MDLive falsely and/or misleadingly misrepresents the facts relating to its PRIME product to clients, potential clients, and members of the public, including by continuing to claim that its PRIME product includes the GoodRX card/functionality and the second-opinion tool.

95. Those representations are literally false or are otherwise misleading and deceptive, and have served to harm BenAdmin's economic prospects.

96. MDLive made and continued to make those representations in various commercial advertising and promotion, including on its website and on the popular video website YouTube.

97. In reality, MDLive is misrepresenting the nature, characteristics, and qualities of its PRIME product.

98. MDLive's misrepresentations actually or are likely to deceive a substantial segment of its intended audience of potential clients, including Plaintiffs' clients and prospective clients, as well as the public.

99. By publishing those misrepresentations on its website, YouTube, and elsewhere, MDLive has caused them to enter interstate commerce, specifically because MDLive advertises its services as being accessible from anywhere in the United States, and targets the marketing of its services to potential clients across the United States.

100. MDLive's representations violate Title 15, Section 1125 of the United States Code, and have harmed Plaintiffs' existing and potential economic prospects.

101. More specifically, MDLive's false advertising has harmed Avrec's reputation with its clients and customers, to whom it sold PRIME product in reliance on it functioning as MDLive represented it would.

102. BenAdmin has also suffered harm, in that it would have realized an amount believed to be at least $100,000 in profits from clients and customers referred by Avrec, had Avrec known that MDLive's PRIME product was not functioning as advertised.

103. MDLive's false representations and overcharging of Avrec's clients and customers were both intentional and willful.

104. Because of MDLive's false advertising, Plaintiffs have been damaged in an amount to be proven at trial, but in no event less than an amount believed to be $100,000.

105. Plaintiffs are further entitled under Title 15, Section 1117 of the United States Code to a disgorgement of all profits MDLive received from its false advertising of the PRIME product, and all other remedies provided at law or equity.

### COUNT VIII:
### Declaratory Judgment – BenAdmin Against MDLive
### (Federal Law, 28 U.S.C. § 2201)

106. The allegations set forth in paragraphs 1 through 55 above are incorporated herein and realleged in support of this Count.

107. An actual controversy has arisen between MDLive and BenAdmin with respect to the invoice described in paragraph 47, insofar as MDLive believes it is owed the amount of money described therein and BenAdmin does not believe it owes MDLive that money.

108. That controversy is within this Court's jurisdiction because it exists between two citizens of different States and the amount in controversy exceeds $75,000.

109. The controversy does not involve any of the matters that are excluded in Title 28, Section 2201 of the United States Code from the Court's declaratory jurisdiction.

110. Accordingly, BenAdmin is entitled to a declaration of its rights and obligations with respect to the sum of money allegedly owed per the invoices described in paragraphs 47 and 53 through 54 above.

## COUNT IX:
### Declaratory Judgment – BenAdmin Against MDLive
### (State Law, FL. STAT. §§ 86.011-111)

111. The allegations set forth in paragraphs 1 through 55 above are incorporated herein and realleged in support of this Count.

112. Because MDLive has sent BenAdmin the invoice described in paragraph 47 and is now expecting payment of that invoice, there is now a bona fide, actual, and present practical need for the Court to declare the respective rights of the parties regarding the amount owed.

113. BenAdmin seeks a declaration of the parties' respective rights with a present and ascertained state of facts or present controversy as to a state of facts.

114. BenAdmin's and MDLive's respective rights to the sum allegedly owed depend on this Court's explication of the law applicable to that state of facts.

115. All of BenAdmin's and MDLive's interests in the sum allegedly owed are properly before the Court through process.

116. Accordingly, BenAdmin is entitled to a declaration of its rights and obligations with respect to the sum of money allegedly owed per the invoices described in paragraphs 47 and 53 through 54 above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray the Court enter judgment in their favor, against MDLive, and afford the following relief:

A. An award of compensatory damages in an amount to be determined at trial, but in no event less than $100,000;

B.      A disgorgement of MDLive's profits from falsely advertising the PRIME product;

C.      An award of exemplary damages for MDLive's conduct pursuant to Title 18, Section 1836 of the United States Code;

D.      An award of BenAdmin's attorney fees as permitted by contract or statutes, including without limitation Section 688.005 of the Florida Statutes, Title 15, Section 1117 of the United States Code, and Title 18, Section 1836 of the United States Code;

E.      An award of Plaintiffs' costs in bringing this action; and

F.      Such other and further relief as the Court may find equitable or just in the premises.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues triable as a matter of right by jury.

Respectfully Submitted,

**HALL BOOTH SMITH PC**
1400 Centrepark Boulevard, Suite 400
West Palm Beach, FL  33401
Telephone: (561) 472-1020
Facsimile: (561) 472-1021


By:   /s/  *John D. Heffling*
       JOHN D. HEFFLING
       Florida Bar No. 500770

Dated this 26th day of October, 2021.